Exhibit 1

CCN #13184326  –  Event # 13184326 Internal Packet                    Metropolitan Police Department

## CCN #13184326 – INCIDENT REPORT

| REPORT DATE / TIME | DISTRICT / PSA | EVENT START DATE / TIME - EVENT END DATE / TIME | INCIDENT STATISTICS | | |
|---|---|---|---|---|---|
| Dec 26, 2013 08:33 | Seventh District / 701 | Dec 26, 2013 08:33 - Dec 26, 2013 08:33 | | | |

| RESPONDING OFFICER | | WEATHER | | | |
|---|---|---|---|---|---|
| Ashley Keels (#9727) – MPD | | Snow | | | |

ASSISTING OFFICER (ASSIST TYPE)

Ashley Keels (#9727) (Other), MATTHEW HARMAN (#9724) (Other), ALFRED MYERS (#3328) (Other)

| TELETYPE DATE / TIME | TELETYPE # | WHO NOTIFIED TELETYPE | | SHOTS FIRED | SHOTS EFFECT |
|---|---|---|---|---|---|
| | | | | ☐ YES ☐ NO | ☐ YES ☐ NO |

LOCATION REPORT TAKEN

1728 W ST SE, WASHINGTON, DC 20020  **Unit:** L  **Type:** Other/ Unknown  **Public/Private:** Private  **PSA:** 701  **District:** Seventh District

| POSITION (BEHIND,FRONT,INSIDE,SIDE) | LOCATION DESCRIPTION |
|---|---|
| Inside | Designation: APARTMENT/CONDO UNIT, Premise: OTHER RESIDENCE (APARTMENT/CONDO) |

## REPORTING PERSON

## INCIDENT INFO

INCIDENT TYPE

Family Disturbance

INCIDENT LOCATION

| LOCATION TYPE | POSITION (BEHIND, FRONT, INSIDE, SIDE) |
|---|---|
| | |

LOCATION DESCRIPTION

## SUBJECTS

| SUBJECT-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| SUB-1 PERRY, CRYSTAL MARIE | ██████ |

| SEX | RACE / ETHNICITY | PHONE | EMAIL |
|---|---|---|---|
| Female | Black / Not Hispanic Or Latino | ███████████ | |

HOME ADDRESS

████████████████  **PSA:** 502  **District:** Fifth District

| SUBJECT-2 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| SUB-2 YOUNG, LAMONT ANDRE | ██████ |

| SEX | RACE / ETHNICITY | PHONE | EMAIL |
|---|---|---|---|
| Male | Black / Not Hispanic Or Latino | ███████████ | |

HOME ADDRESS

NO A FIX, WASHINGTON, DC

## WITNESSES

## PROPERTY & ITEMS

## LEGACY DATA

| CASE STATUS DATE | 12/26/2013 09:18 |
|---|---|
| CASE STATUS | OPEN |

CCN #13184326  –  Event # 13184326 Internal Packet                                    Metropolitan Police Department

| ATTEMPTED / COMPLETED | Completed |
|---|---|
| ALCOHOL BEVERAGE CONTROL | N |
| OFFENDER RELATED TO LOCATION ESTABLISHMENT | N |
| WEAPON OR FORCE INVOLVED | None |
| SUSPICIOUS ACTIVITY | NONE |
| LOCATION PROPERTY TYPE | PRIVATE |

CCN #13184326  –  Event # 13184326 Internal Packet                                     Metropolitan Police Department

## CCN #13184326 – PUBLIC NARRATIVE

ON December 26TH,2013 C-1 AND C-2 HAD A VERBAL ALTERCATION OVER C-2 LEAVING THE RESIDENCE. C-2 HAD COMPLIED WITH C-1 REQUEST OF LEAVING THE RESIDENCE. PRIOR TO MPDC OFFICERS ARRIVAL ON THE SCENE. C-1 DID NOT HAVE ANY PHYSICAL INJURIES.C-1 DID NOT COMPLAIN OF ANY INJURIES.MPDC OFFICERS ADVISED C-1 OF OCAP BENIFITS .AND COUNSELING SERVICES

## CCN #13184326 – INTERNAL NARRATIVE

C-1 AND C-2 HAVE BEEN DATING ON AND OFF SINCE 2011. C-1 OBSERVED C-2 PUTTING A BLACK Semiautomatic HANDGUN. BLACK IN COLOR. IN HIS WAIST BAND AS HE WAS LEAVING THE RESIDENCE.C-1 STATED SHE HAD NO PRIOR KNOWLEDGE OF THIS WEAPON UNTIL TODAY. C-1 GAVE MPDC OFFICERS A LOOK-OUT AND DESCRIPTION OF C-2. C-1 ALSO TOLD MPDC OFFICERS THAT C-2 IS KNOWN TO BE IN THE AREA NEAR SADDLES DISCOUNT STORE AND 2200 BLOCK OF ALBAMA AVENUE SE. C-2 STATED TO C-1 THREATS TOWARDS LAW ENFORCEMENT. C-2 WOULD LEAVE THE APARTMENT WHEN HE WAS READY.

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| MATTHEW HARMAN (#9724)    12/26/2013 (e-signature) | MATTHEW HARMAN (#9724)    12/26/2013 (e-signature) |
| PRINT NAME | PRINT NAME |
| MATTHEW HARMAN (#9724) | MATTHEW HARMAN (#9724) |

## APPROVAL HISTORY

Event # 13184326
Report Submitted by MATTHEW HARMAN (#9724)
Dec 26, 2013 08:33

I/LEADS APPROVAL: Approval Request for Case # 13184326
Report Submitted by MATTHEW HARMAN (#9724)
Dec 26, 2013 12:32

I/LEADS APPROVAL: Approval Request for Case # 13184326
Report Completed by JONATHAN PODORSKI (#4590)
Dec 26, 2013 12:40

Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

| | |
|---|---|
| IN THE MATTER OF: | : |
| | : |
| LAMONT ANDRE YOUNG | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. |
| | : 1:14-cv-2129 |
| DISTRICT OF COLUMBIA, et al.: | (BAH) |
| | : |
| Defendants. | : |
| | : |

Thursday,
June 22, 2017

Washington, D.C.

DEPOSITION OF:

LAMONT YOUNG

called for examination by Counsel for the

Defendants, pursuant to Notice of Deposition, in

the law offices of the District of Columbia

Office of the Attorney General, located at 441

Fourth Street, N.W., Suite 630 South, when were

present on behalf of the respective parties:

1      Perry?

2           A      I don't have an exact date.  Roughly

3      around about --

4           Q      I don't need an exact date.

5           A      Okay.  Around about ten years at the

6      time.

7           Q      Okay.  As of the day after Christmas

8      2013, how long had you been living there?

9           A      Could you repeat the question?

10          Q      Yeah, how long had you been staying

11     with Ms. Perry?

12          A      Oh, probably, like, about since --

13     that was probably a month.

14          Q      A month?  Strictly friendship, is that

15     what you said?

16          A      Yeah, that's all.

17          Q      Okay.  On that day, December 26, 2013,

18     did you get into a verbal dispute with her?

19          A      Yes.

20          Q      Okay.  Tell me about that.  What was

21     that about?

22          A      She woke up in the morning.  She got

1      Q      You have to explain that to me.

2      A      Okay.  When I went in the barbershop,

3  I went to my barber and I asked him.  I said,

4  today my birthday.  You got me a free haircut

5  today, right?  He said, yeah, I got you.  I got

6  two people in front of you.  I said, all right.

7  Let me see your keys so I can run to Martin's and

8  get me some breakfast.  He said, all right, and

9  gave me his keys.

10      Q      What do his keys have to do with

11  Martin's for breakfast?

12      A      I got to drive to Martin's to get the

13  breakfast.

14      Q      Okay.  So you asked him to -- I'm

15  sorry.

16      A      Yeah, asked him --

17      Q      You asked him to borrow his car?

18  Okay.

19      A      -- to borrow his car, yes, yes, yes,

20  yes.

21      Q      Okay.  So you were -- and this is the

22  guy who runs the barbershop or is it somebody

1      Q      All right.  What kind of car did he

2   have?

3      A      A Lexus.

4      Q      What year?

5      A      I don't know.

6      Q      New?  Old?

7      A      It was --

8      Q      Pretty good shape?

9      A      It wasn't brand-new, but it wasn't

10   too, too old.

11      Q      Okay, okay.  What's this guy's name in

12   case I needed to borrow a car?

13      A      Anthony.

14              MS. NORMAN:  It's in the report, and

15   I'll get it.

16              MR. DEBERARDINIS:  Yeah, I've got the

17   names here.  I want to come to that in a minute

18   anyway.  Okay?

19              MS. NORMAN:  All right.

20              BY MR. DEBERARDINIS:

21      Q      Okay.  So were you walking towards his

22   car when you first saw the police?

1      A      No, I was standing still when I first

2   saw the police.

3      Q      Well, why were you standing still if

4   you were going to go get breakfast?

5      A      Because I was talking.

6      Q      Who were you talking to?

7      A      To some guys that be selling

8   cigarettes out there.

9      Q      Singles or whatever they're called?

10      A      Yeah, singles cigarettes.

11      Q      What's the word for that?

12      A      Single cigarettes.

13      Q      There's some nickname.  It doesn't

14   matter.  Was it your intention to buy one of

15   those singles, or --

16      A      No, sir.

17      Q      Okay.  So you were having a

18   conversation with the guys selling the singles?

19      A      Mm-hmm.

20      Q      Okay.  Then what happened?

21      A      We was talking and then I heard him

22   say, there go Allen.  I'm gone.

1          A      The answer is no.

2          Q      Okay.  So the guys selling the

3    singles, they indicate, Allen is here, I'm out of

4    here --

5          A      Yeah.

6          Q      -- basically?

7          A      That's what they always do.  Allen

8    come around, everybody just -- just -- they just

9    disperse themselves.

10         Q      Well, they stop selling their singles

11   for starters, right?

12         A      No, they sell cigarettes.

13         Q      No, no.  But when he's there, they

14   leave?

15         A      Yeah, they're going to leave when he

16   come.

17         Q      Okay.  And is that what happened?  Did

18   they leave?

19         A      Yeah, they left.  They said, there go

20   Allen.  I'm gone.

21         Q      And how many of them were there?

22         A      I think maybe two or three people I

1    was talking to.

2         Q     Okay.  And then what happened?

3         A     From where?

4         Q     Okay.  Did Allen pull up his -- did

5    Allen pull his vehicle -- did he park or stop or

6    what did he do?

7         A     Well, once they said, here come Allen,

8    my back is right here towards that way, and this

9    is where --

10        Q     Towards what way?

11        A     Towards that way.  Okay.  I'm standing

12   right here, but I'm facing this way, so my back

13   is toward this way.  This is where Allen coming

14   in at, so I didn't see him coming in.  I just

15   heard them say, there go Allen.  I'm gone.

16        Q     Okay.  So you're saying you had your

17   back -- you didn't see his car approaching?

18        A     Right.

19        Q     Okay.  Did you turn around when they

20   said that?

21        A     No, because by then, he was coming,

22   pulling past me and coming.  You know what I'm

1    saying?  So I had to turn around because he was

2    already coming past me.

3            Q     And what did he do with his vehicle?

4            A     By then, they had already dispersed.

5    I'm still standing right there by myself.  When

6    Allen comes out the parking lot right here beside

7    me, he pulls right here directly in front of me.

8            Q     Okay.  He pulls in front of you.  Why

9    don't you put an "A" where he pulls in front of

10   you.

11           A     Right here.

12           Q     So it was across the street from you?

13           A     Mm-hmm.

14           Q     You have to make that "A" a little

15   bigger, if you don't mind.  Okay.  That's much

16   better, thank you.  Okay.  He stops his vehicle,

17   I take it, where you put that "A"?

18           A     Mm-hmm.

19           Q     And what happens next?

20           A     Okay.  He gets out of the car and then

21   he looks to me and he say, take your hands out

22   your pockets.

1        Q       Did he say anything else?

2        A       Uh-uh.  That's his first command.

3        Q       Okay.  So then what happened?

4        A       I take my hand out of my pocket.  And

5    as I'm taking my hand out of my pocket, he's

6    walking, coming towards me.

7        Q       So he exited the vehicle?

8        A       Yeah, he was already exited the

9    vehicle when he asked me to take my hand out of

10   my pocket.

11       Q       Okay.  And he's walking towards you?

12       A       Mm-hmm.

13       Q       Then what happened?

14       A       I step off the step thing and started

15   walking --

16       Q       Wait a minute.  When you say you

17   stepped off the step thing, what does that mean?

18   What step thing?

19       A       Where the "X" at.

20       Q       Is there a curb there or what?

21       A       That's the cement thing right there,

22   and the curb is connected to it.

1    Q    Okay.  You stepped off of it --

2    A    Mm-hmm.

3    Q    -- and then --

4    A    I stepped off -- off of this right

5    here.  When he started walking, coming across

6    towards me, I stepped off of this and started

7    walking.

8    Q    So you were walking where?

9    A    While he's coming -- while he's coming

10   across this way, I'm going back the way that he's

11   coming, but I'm walking down at an angle.

12   Q    Where were you going?

13   A    I'm walking down here.  I'm going down

14   the street away from him and his harassing.

15   Q    Now, so you viewed -- his telling you,

16   get your hands out of your pocket, you view that

17   as harassing you?

18   A    Yeah, because I felt as though I was

19   standing right there.  I'm not doing nothing.

20   Q    Did you have your hands in your

21   pocket?

22   A    Yeah, but it's December.

1         Q     Okay, okay.  So you're walking, he's

2    coming towards you and then why don't you draw an

3    arrow in the direction that you were headed --

4         A     Can you say that --

5         Q     -- from that "X".

6         A     From that "X"?

7         Q     Yeah.

8         A     Show you what?  Show you what?

9         Q     Draw an arrow --

10        A     Okay.

11        Q     -- where you -- draw a line and an

12   arrow where you were headed.

13        A     Okay, okay.  So I was walking down

14   that way.

15        Q     And you were doing that just to avoid

16   him, would that be --

17        A     Mm-hmm.

18        Q     -- fair to say?

19        A     Yes.

20        Q     And then what happened?

21        A     As I stepped off there, well, as he

22   told me to take my hands out of my pocket, I

1    pulled them out.  And then when I stepped off the

2    thing, started walking down the street, I put my

3    hands back in my pocket.  By then, Mr. Allen,

4    he's throwing commands, take your hands out your

5    pocket, freeze.  I still be walking.

6         Q    You're still walking --

7         A    I still be walking.

8         Q    -- when he told you to freeze?

9         A    Yeah, he told me to freeze, and I

10   still be walking.

11        Q    Why, if he told you to freeze, were

12   you walking?

13        A    Because I just think that he was just

14   out to harass me that day, like he do every day,

15   everybody out there, pulls up on them, harassing.

16   That's just what he do, and I just didn't feel

17   like getting harassed on my birthday.  It was too

18   early on my birthday.  I just didn't feel like

19   it.

20        Q    Okay.  So you continue walking.  Did

21   he say anything else to you?

22        A    Besides the freeze and take your hands

1    out your pocket again, nothing else.

2         Q      Okay, okay.  So what happens is you

3    keep walking?

4         A      Next thing I know, I just hear, pow,

5    I get shot, I fall down.

6         Q      Did you see any other officer?

7         A      After I fell down.

8         Q      Let's take it back.  Before you fell

9    down?

10        A      No.

11        Q      Okay.  Did you see on there where you

12   were when you were shot?

13        A      I don't know the specific, no.

14        Q      No?

15        A      I couldn't say the specific where I

16   got shot.  I just know on that side of the street

17   I was walking, and I got shot over there by where

18   them cars at.  The specific, no, I can't tell

19   you.

20        Q      Do you recall how many times the --

21   did you hear anyone else order you to stop?

22        A      I just heard Allen.

1      Q      Did you know Allen's voice --

2      A      Yeah.

3      Q      -- prior to that?

4      A      I mean, I heard it --

5      Q      Before that?

6      A      -- from the first command.  It sounded

7   the same from the first command.

8      Q      How about from other days?

9      A      No, I never had --

10     Q      You never heard his voice?

11     A      -- a run in with him, yeah.  I never

12  had a run in with him, like, to where though he

13  had to tell me to freeze, or I never heard him

14  yell to nobody else if he told them that specific

15  command, freeze, no.

16     Q      Okay.  Did you ever turn around

17  towards him?

18     A      No.

19     Q      When you were shot, where were your

20  hands?

21     A      They was out my pocket by then because

22  he made the second command to take your hands out

1    your pocket.  And as I was following that

2    command, I got shot.

3         Q    Were you still walking when you were

4    shot?

5         A    No.  I was actually handcuffed on the

6    ground.

7         Q    No, no.  I'm talking about the time

8    you were shot.

9         A    I fell down, then they came and

10   handcuffed me.

11        Q    As you were -- were you shot while you

12   were walking?

13        A    I was walking, then they shot me.

14        Q    Okay.

15             MS. NORMAN:  I'm sorry.  What?  Do you

16   want a break?

17             THE WITNESS:  I want to turn it off,

18   so --

19             MS. NORMAN:  Oh, yeah.  You can turn

20   it off.

21             BY MR. DEBERARDINIS:

22        Q    Is someone listening to all of this?

1        A      What?  That --

2        Q      The hospital bill.

3        A      I don't -- I have no idea.

4               MS. NORMAN:  The bill says on it that

5        it was paid by D.C. Medicaid.

6               MR. DEBERARDINIS:  Okay.  Thank you.

7        Thank you, Counsel.

8               BY MR. DEBERARDINIS:

9        Q      Okay.  When you got out of the

10       hospital, where you did you stay?

11       A      In jail.

12       Q      Oh, I apologize.  And then you were

13       found guilty of possession of a weapon?

14       A      Unlawful possession of a firearm and

15       carrying a pistol without a license.

16       Q      And that was the one that your

17       girlfriend -- not your girlfriend, pardon me --

18       A      My friend.

19       Q      -- that your friend said you had the

20       day before.  Is that the one you were found

21       guilty of?

22       A      The one that say that I left?

Exhibit 3

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3    ----------------------------x

4    LAMONT ANDRE YOUNG,              :

5           Plaintiff,               :

6       v                            : Civil No.:

7    DISTRICT OF COLUMBIA, et al.,: 1:14-cv-2129 (BAH)

8           Defendants.              :

9    ----------------------------X

10

11       Deposition of OFFICER THURMAN POWELL

12              Washington, DC

13           Wednesday, June 21, 2017

14              10:13 a.m.

15

16

17

18

19

20   Job No.: 149218

21   Pages: 1-157

22   Reported by: Suja Nair

1    of this incident over --

2       Q.    Twenty-four hours before?

3       A.    Yes, sir.

4             It -- it was a broadcast given that your

5    client, the defendant, was armed with a weapon, and

6    the suspect -- they gave a lookout for the suspect

7    clothing.  And we -- when we approached the

8    suspect, he had on the same exact clothing matching

9    the lookout.

10      Q.    I see.

11            That's all you knew about him at that

12   point?

13      A.    As far as what, him -- him being armed

14   with a weapon and making threats against law

15   enforcement personnel?

16      Q.    What threats?

17      A.    He -- it was just broadcast that he made

18   threats against law enforcement personnel.

19      Q.    What threats?

20      A.    Like I just said --

21            MR. DEBERARDINIS:  It's asked and

22   answered.

1      Q.    So what you're saying is all you knew is

2   somebody said he made threats?

3      A.    It's not what somebody said.  It was

4   another police officer; another sworn police

5   officer taking a statement from the defendant's

6   girlfriend.

7      Q.    And you knew all that at the time that

8   you shot him?

9      A.    Yes, sir, I did.

10      Q.    Okay.  And how -- the threats, how many

11   hours before?

12      A.    Well, this happened the previous day,

13   before -- before the incident with him.

14      Q.    Okay.  Help me out here.  And I'm going

15   to divert a little bit from -- from the sequence I

16   have.

17           If you've got a guy you think is

18   dangerous and making threats to police officers --

19   and you and how many other officers approached him?

20      A.    Two.  Me and another officer.

21      Q.    Okay.

22      A.    So it was two of us.

1    Q.    Okay.  And, basically, you're telling him

2    to get his hands out of his pockets.  Is that

3    accurate?

4    A.    Yes, sir.

5    Q.    Nobody told him to put his hands where we

6    can see them, did you?

7    A.    The other officer did tell him to take

8    his hand out of his pockets and put his hands up.

9    Q.    Okay.

10   A.    He -- take his hands out of his pockets

11   and put his hands up where we could see them.

12   Q.    Put them where we could see them?

13   A.    Right.

14   Q.    And he was in the process of doing that

15   when you shot him.  Isn't that true?

16   A.    No, sir.  That's not --

17   Q.    Did you see a gun?

18   A.    No, I didn't.

19   Q.    Did you hear a threat, I'm going to shoot

20   you or I'm not going to do it or I'm going to harm

21   you?

22   A.    No, I didn't.

Transcript of Officer Thurman Powell
Conducted on June 21, 2017                          47

1        Q.    Was he doing anything that was assaultive

2    or threat -- threatening that day?

3        A.    Yes, he was.

4        Q.    What?

5        A.    He was refuse -- he was not listening to

6    our orders.  Then, before I shot him, he took his

7    hands out his pocket and put it inside of his

8    jacket.

9        Q.    Okay.  Now, help me out here.  Help me

10   out here.

11             He's not following your orders?

12       A.    Right.

13       Q.    And that's assaultive conduct?

14       A.    What you mean, Assaultive conduct?

15       Q.    The question was:  Did he engage in any

16   assaultive conduct toward you or any of the other

17   officers?

18       A.    Yes.  I mean, he -- when we first

19   encountered your subject, your subject was standing

20   against the store.  We gave him commands.  He

21   refused -- he didn't listen to our commands.  He

22   began to walk off; walk away from us.

```
1    the -- the right that you had to talk to him at

2    that point if he didn't want to?

3        A.    That he was supposed to have been armed

4    with a weapon.

5        Q.    Okay.

6        A.    He had a dangerous weapon on the -- on

7    the street, and we were investigating him.

8        Q.    I see.

9              Did you tell him he was under arrest?

10       A.    No.  Because at the time, he wasn't under

11   arrest.

12       Q.    Did -- did you tell him that you were

13   stopping him; that you wanted --

14       A.    Yes.

15       Q.    -- to --

16       A.    Yes.

17       Q.    What did you say exactly?

18       A.    My -- my partner, the officer who I

19   assisted, told him to stop, take his hand out of

20   his pocket, we need to talk to him.

21       Q.    Okay.  You need to talk to him?

22       A.    Right.
```

Transcript of Officer Thurman Powell
Conducted on June 21, 2017                          51

1      A.     Because we was in the middle of -- we was

2   in the middle of the -- we was in the middle of the

3   parking lot, and you had citizen -- citizens

4   walking around.

5      Q.     Did you have cars in the --

6      A.     Yeah.  We had -- we had cars, but it

7   still -- it went down so fast.  Once we approached

8   him, your -- the defendant began to walk off, so we

9   had to follow him.  We didn't have time to take

10  cover.

11     Q.     Did you circle him?

12     A.     What do you mean, Circle him?

13     Q.     You've got three officers there.  Did

14  everybody --

15     A.     It wasn't three.  It was two.

16     Q.     -- approach -- two?

17     A.     You keep saying three.  It was two.

18     Q.     All right.  Where were you at the time

19  that you stopped Mr. Young?

20     A.     The defendant had walked from the -- from

21  the store, over to the middle of the street, over

22  to his vehicle -- over toward a vehicle.  So we was

1          MR. BOND:  I'm asking him.

2          MR. DEBERARDINIS:  Oh, okay.

3     A.    You said that says how many shots were

4    fired?

5     Q.    No.  I'm asking you.

6          How many shots were fired?  Is that --

7     A.    One.

8     Q.    One?

9     A.    Yes.

10    Q.    Do you have any understanding as far as

11   what one, two, three, four, five, six, seven, eight

12   depicts in that diagram?

13    A.    No, I don't.

14    Q.    Does that appear to be a diagram of the

15   scene where this incident occurred?

16    A.    That's what I'm trying to -- I'm trying

17   to figure that out now.

18    Q.    Well, let me also re-orient you.  Was

19   there a Trial Board that you participated in?

20    A.    Yes, sir.

21    Q.    Was this an exhibit at the Trial Board?

22    A.    If it was, I don't remember.  Like I say,

Transcript of Officer Thurman Powell
Conducted on June 21, 2017                              58

```
1        Q.    Okay.  And did you receive a briefing
2   that day at roll call about things to watch out
3   for?
4        A.    Yes.
5        Q.    What did that briefing consist of, if you
6   can --
7        A.    I couldn't answer -- I can't -- I can't
8   remember that.  I will have to get my notebook for
9   that day.
10       Q.    I see.
11             Well, did that briefing include a -- a --
12  an alert involving Mr. Young?
13       A.    I can't answer that.  I will have to get
14  my notebook, to look in my notebook.
15       Q.    What about the day before?
16       A.    The day before?  I remember the day
17  before because I heard it myself.
18       Q.    Okay.  Now, how do you know Mr. Young?
19       A.    I don't know him personally.  I know -- I
20  just know the individual that we stopped that day.
21       Q.    Well, did you know Mr. Young the day you
22  shot him?
```

1      A.    I didn't know him personally, but Mr.

2  Young, the defendant, had on the clothing that his

3  girlfriend and that the officer voiced over the

4  radio.

5      Q.    I see.

6            So -- okay.  What was the clothing

7  description that you had of Mr. Young from the day

8  before?

9      A.    I don't -- I can't -- I don't remember

10  that right offhand.

11      Q.    Do you recall what Mr. Young was wearing?

12      A.    I know Mr. Young had on -- I would have

13  to look back at my notes.  I would have to look

14  back at my notes, because I honestly don't remember

15  what clothing he had on that day.

16            I know the clothing matched.  The same

17  clothing that the officer gave over the Seventh

18  District radio, Mr. Young had those same clothing

19  on the day that I encountered him.

20      Q.    So you had a clothing description which

21  involved, what, a black male?

22      A.    Yes, sir.

1    know.

2         Q.    And -- but you didn't know what -- and I

3    assume the same applied the day of the incident,

4    right?

5         A.    What, that -- whether Officer Allen knew

6    him or not?

7         Q.    Right.  Right.

8         A.    I couldn't -- I couldn't answer that.

9         Q.    Now, you indicated that you were in one

10   squad car.  Officer Allen was in another, and

11   Officer Allen radioed for assistance --

12        A.    Yes, sir.

13        Q.    -- and you responded?

14        A.    Yes.  Yes, sir.

15        Q.    Okay.  Accurate?

16        A.    Yes, sir.

17        Q.    What did Officer Allen say in the

18   transmission, asking for assistance, before you

19   responded?

20        A.    He request -- he requested -- he came

21   across the radio.  He requested for assistance.  He

22   stated that the guy -- the guy -- the guy that --

1    the guy that Meyers gave a lookout for yesterday is

2    standing in front of 2201 Alabama Avenue with the

3    same clothing and the same lookout.  And he asked

4    for assistance and said the guy is supposed to be

5    armed with a gun.

6        Q.   Now, was that on a recorded channel or

7    was that a non-recorded channel?

8        A.   It's a recorded channel.  It was

9    broadcast over the Seventh District radio.

10       Q.   Okay.  Do you know if that recording

11   still exists?

12            MR. DEBERARDINIS:  Yeah, and you have it.

13            MR BOND:  Do we?

14            MR. DEBERARDINIS:  Yes.

15            MR. BOND:  Okay.

16       Q.   Okay.  So you respond; is that right?

17       A.   Yes.  Yes, sir.

18       Q.   Okay.  When you responded, when you got

19   there, to the scene, what was Officer Allen doing?

20       A.   If I remember correctly, he waited until

21   I pulled up, and I think he exited the vehicle.  I

22   exited my vehicle.  Then we began to -- he told me

1    what was going on.  We began to approach the

2    defendant.  And once we began to approach him,

3    Officer Allen then began give -- giving verbal

4    commands.

5        Q.    Okay.  Now, you approached the defendant

6    on foot, correct?

7        A.    Yes, sir.

8        Q.    How far away were your -- your patrol

9    vehicles that you got out of?

10       A.    I will say -- I will say maybe --

11   approximately maybe 40 to 50 feet.  The store was

12   -- we was parked on the side of the curb, closer to

13   the store, and the store was down.  So I'm -- so I

14   will say approximately maybe 40 feet.

15       Q.    Okay.  Now, you indicated that it was not

16   possible for you to take cover because of the

17   circumstances?

18       A.    Yes, sir.

19       Q.    What prevented you from driving your --

20   your patrol vehicles right up to where the suspect

21   was standing?

22       A.    Because we -- we didn't know whether the

Transcript of Officer Thurman Powell
Conducted on June 21, 2017                                    76

1        Q.      Okay.

2        A.      Left and right.

3                So we approach -- we approached the --

4        the defendant.  He was standing -- I think the

5        address was 2201 Alabama Avenue, the discount --

6        that little discount store.  He was standing

7        against the wall.

8                Officer Allen told him -- he said, Sir,

9        we need to talk to you; take your hands out your

10       pocket; let us see your hands.  He ignored us.

11       Officer Allen then said, Sir, take your hands out

12       your pocket; we need to talk to you; take your

13       hands out your pocket; let us see your -- let us

14       see your hands.

15               He refused again.  I then gave the order,

16       Take your hands out your pocket; let us see your

17       hands; take your hands out your pocket.  The

18       defendant then began to walk away.  He began to

19       walk towards the left, headed towards the street.

20       Q.      Away from you?

21       A.      Away from us.  We was --

22       Q.      Away from -- also from Officer Allen?

1      A.    Right.

2      Q.    Okay.

3      A.    I will say we were maybe ten to fifteen

4  feet from him.  He began to take off walking.  Then

5  Officer Allen said, Sir, stop; let me see your

6  hands; take your hands out your pockets; stop.

7            He then took his hand out his pocket and

8  walked between the two parked -- it was two parked

9  cars.  He walked between the parked cars.  We still

10  following him.  Officer Allen saying, Stop, sir;

11  stop.  I'm both saying, Stop; stop; sir, stop.

12            So he got in the middle of the street.

13  He then put his hands back in his pocket.  I said,

14  Sir, take your hands out your pocket; let us see

15  your hands; let us see your hands.  He continued to

16  walk.  He walked towards the truck.  It was a van

17  or either a truck right here.

18            He walked that -- he was walking towards

19  that -- the vehicle.  I was coming down at a angle.

20  Officer Allen was coming up at an angle.  We then

21  said, Let us see your hands; let us see your hands.

22  He then snatched his hand out his pocket and put it

1    inside his waistband.

2            And I said, Sir, let me see your hands;

3    let me see your hands.  He then yanked -- jerked,

4    as if he was pulling something out of his

5    waistband.  He jerked his arm out.  I then

6    discharged my weapon.

7        Q.    Okay.  Where was he when he did this?

8        A.    He was standing -- he was like right in

9    front of -- it was a van or truck parked right

10   here.  He was standing right there, and I was --

11       Q.    In front of the van?

12       A.    -- at an angle.

13            At the -- at the driver's door.

14       Q.    Okay.  Now, where were you at the time

15   this happened?

16       A.    I was towards his right; like at an

17   angle, coming down the hill.

18       Q.    How far away from him?

19       A.    I will say maybe 20 -- maybe 20 -- 20

20   feet, if that.  Approximately about 20 feet.

21       Q.    And how far was Officer Allen from him?

22       A.    On the left -- Officer Allen was on the

1   his jacket, I put my -- my weapon in a tuck

2   position.

3       Q.    Okay.

4       A.    Then, when he jerked out, that's when I

5   raised it and discharged one round.

6       Q.    Okay.  Now, while you were doing this,

7   were you able to observe what Officer Allen was

8   doing?

9       A.    I could see Officer Allen like out of the

10  -- the -- the side view of my eye, but I was mainly

11  focused on Mr. -- the defendant.

12      Q.    The record should reflect that you

13  pointed to your left eye.

14      A.    Right, because we was on the left, and so

15  I could see him.  I could see Officer Allen like

16  towards the -- the side -- the side.  Like, I could

17  be looking at her, and I could still see you like

18  on the -- on the left side.  That's what I'm

19  saying.

20      Q.    Okay.  All right.  I think we've gotten

21  to a point where you said that he made a jerking

22  motion?

```
 1        Q.    Did Officer Allen ask you why you shot

 2   him?

 3        A.    No.

 4        Q.    He never asked you that?

 5        A.    No, sir.

 6        Q.    Okay.  Did you say anything to Mr. Young

 7   after you shot him?

 8        A.    No, sir.

 9              I didn't deal with him after he was shot.

10   I called -- called the ambulance and called for my

11   supervisors.  Once my supervisors got on the -- I

12   mean, because people was coming on the scene like

13   instantly.  So they pulled me away.  They pulled me

14   away from the defendant and --

15        Q.    Who pulled you away from the defendant?

16        A.    It was a --

17        Q.    By, The defendant, we're talking about

18   Mr. Young, correct?

19        A.    Yes.  Yes.

20        Q.    At that point, he's a defendant, not a

21   suspect.

22        A.    He's been -- at the -- at the time --
```

Transcript of Officer Thurman Powell
Conducted on June 21, 2017                    100

1    to a different area here.

2         A.    Okay.

3         Q.    Okay.  All right.  You've got a lawyer

4    there representing you.  There is a counselor there

5    for you to talk to?

6         A.    Yes.

7         Q.    Did you talk to the counselor, meaning

8    the person that --

9         A.    The therapist?

10        Q.    -- you talk to about how you're feeling?

11        A.    Right.

12        Q.    How long did you talk to the counselor

13   about how you were feeling?

14        A.    Maybe five or ten minutes.  She basically

15   just asked me, you know, how was I doing; how was I

16   feeling.  And at the time, I was okay, I guess,

17   because I was still in -- in shock or -- not shock,

18   but my adrenaline was still -- still pumped.

19        Q.    Okay.

20        A.    So at the time, you know, I was -- I was

21   okay.

22        Q.    Okay.  Now, there was no gun found on Mr.

1   Young that day, was there?

2        A.    Not on him, but it was in the vehicle

3   that he had --

4        Q.    Well --

5        A.    -- from what was told -- from what was --

6   the investigation revealed.

7        Q.    Well, I guess my question for you -- and

8   what I'm trying to bring out -- is, when you shot

9   him, he was unarmed.  Isn't that true?

10       A.    At the time, yeah.  At the time, yes.

11       Q.    Okay.  And did Mr. Young say anything to

12   you at the scene?

13       A.    No, sir.

14       Q.    Did Mr. Young say anything to Officer

15   Allen at the scene?

16       A.    I can't answer that because I wasn't

17   there.

18       Q.    Well, let me rephrase it.

19             Did you hear Mr. Young say anything to

20   Officer Allen?

21       A.    Not that I -- no, not that I remember.

22       Q.    All right.  Did anyone attempt to

Transcript of Officer Thurman Powell
Conducted on June 21, 2017                                111

1              MR. SERRANO:  The conviction was the gun,

2      the day before, when the girlfriend called the

3      cops.  He was acquitted of the gun the day of the

4      shooting.

5              MR. DEBERARDINIS:  How is that possible?

6              MR. SERRANO:  That's what the jury

7      decided.

8              MR. DEBERARDINIS:  And that wasn't

9      overturned on appeal?

10             MR. BOND:  Government can't appeal.

11             MR. DEBERARDINIS:  No.  No.  No.  How --

12     well --

13             MR. SERRANO:  The jury believed the

14     girlfriend -- she was the only witness --

15             MR. DEBERARDINIS:  Hm-mmm.

16             MR. SERRANO:  -- that he possessed a gun

17     --

18             MR. DEBERARDINIS:  Okay.

19             MR. SERRANO:  -- on the day before the

20     shooting.

21             MR. DEBERARDINIS:  And they found him not

22     guilty of it the next day?

Transcript of Officer Thurman Powell
Conducted on June 21, 2017                     125

1        Q.    It's called a senior moment.

2              When you shot Mr. Young, was he facing

3     you?  Was his back to you?

4        A.    He had did a launch -- like a jerking

5     motion and, like, did like this.  So his body had

6     twisted towards me.

7        Q.    Well, when he was standing in front of

8     that -- I think you said it was like a Toyota van

9     or something that had --

10       A.    Hm-mmm.

11       Q.    -- a Toyota truck, was he facing you and

12    Officer Allen or did he have his back to you?

13       A.    Oh, his back.  I'm sorry.  I

14    misunderstood the question.

15             His back was towards us at that time.

16       Q.    So his back was towards you?

17       A.    Hm-mmm.

18             But my angle -- the angle where I was, I

19    could see.  He was standing here.  My angle was

20    here.  So I could see like his whole -- you know,

21    his whole body, like, if you understanding what I'm

22    saying.  I was standing at a angle, but his back

1    was towards us.

2         Q.    So his back was towards you, but he stood

3    at an angle that allowed you to see the rest of his

4    body?

5         A.    Right.

6               Because he was stand -- he was stand --

7    he was standing this way, and I was at an angle,

8    but -- which means his back was like going this

9    way, but I was still at a angle.  He wasn't facing

10   me.  He was -- I was at an angle.  So his --

11        Q.    Okay.

12        A.    -- back was going that way.

13        Q.    And where was his body in relation to

14   Officer Allen, from where he was standing?  Could

15   you tell?

16        A.    Well, Allen had the same -- well, where

17   Allen -- where Officer Allen was standing, he was

18   standing like sideways, also, but he was on the --

19   like on the opposite side of him.

20        Q.    So -- all right.  So, basically, you're

21   saying he twisted around.

22               Did he twist toward you or did he twist

Transcript of Officer Thurman Powell
Conducted on June 21, 2017                        127

1    toward Officer Allen?

2        A.    Towards me.

3        Q.    Toward you?

4        A.    Yeah.

5        Q.    With his back toward Officer Allen?

6        A.    Yes.

7        Q.    Okay.  Now, do you know what a show-up ID

8    is?

9        A.    A show-up ID?

10       Q.    Yes.

11       A.    Yes.

12       Q.    Would you explain that, as you understand

13   it?

14       A.    Well, a -- a show-up ID is, basically, if

15   we have a -- if we have a complainant and we have

16   someone stopped as a suspect, the detectives will

17   have the complainant to ride by where the person is

18   standing -- the -- the alleged suspect is standing,

19   and will ride by and point that person out.

20       Q.    And I take it there was no show-up ID

21   conducted with Mr. Young?

22            MR. DEBERARDINIS:  I'm -- I'm going to

1      A.    Yeah.  He could have --

2      Q.    So basically keeping his back to Officer

3    Allen, just shooting through his coat?  Is that

4    what you're describing?

5      A.    You're -- you're saying his back, but the

6    angle that we were at -- we were at a angle.  I was

7    -- Officer Allen was on this side.  I was on this

8    side.  The defendant was here.  His back was faced

9    toward this way.

10          He went inside his waistband.  He could

11   have easily shot this way or twisted and shot

12   Officer Allen, or you -- he could have pulled out,

13   like he were doing, like I thought he was going to

14   shoot me.  I thought he was pulling a gun.  So I

15   discharged my weapon.

16      Q.    How is this different from any other

17   encounter that you have with a civilian on the

18   street, a young black male on the street --

19      A.    Most --

20      Q.    -- after a --

21      A.    Oh, I'm sorry.

22      Q.    -- description going out over a -- a

1      Q.     Specifically?

2      A.     Specifically what?  What was the

3  question?

4      Q.     Specifically, what did he do to make you

5  think he had a gun and violated the law?

6      A.     When he put his hand inside of his jacket

7  and made the jerking motion, as if he was pulling a

8  weapon from his waistband, I believed that he had a

9  weapon, and my life was in --

10     Q.     Was there anything else?

11     A.     -- my life was in jeopardy.

12            At the time when I discharged my weapon,

13  yes.

14     Q.     Is there anything else he did to make you

15  think shooting him was justified?

16     A.     I just gave you my answer.

17     Q.     I understand.

18            I'm just asking, is --

19     A.     Well --

20     Q.     -- there anything else?

21     A.     What -- no.

22     Q.     Okay.  Do you agree that there's a

Exhibit 4

1          UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF COLUMBIA

3  ----------------------------x

4  LAMONT ANDRE YOUNG,              :

5           Plaintiff,              :

6     v                            : Civil No.:

7  DISTRICT OF COLUMBIA, et al.,: 1:14-cv-2129 (BAH)

8           Defendants.             :

9  ----------------------------X

10

11      Deposition of OFFICER ANTHONY ALLEN

12              Washington, DC

13          Wednesday, June 21, 2017

14              1:12 p.m.

15

16

17

18

19

20  Job No.: 149218

21  Pages: 1-75

22  Reported by: Suja Nair

Transcript of Officer Anthony Allen
Conducted on June 21, 2017                        8

```
1        A.    No, I did not.

2        Q.    Had you ever seen him before --

3        A.    No.

4        Q.    -- that date?

5              Talk to him before that day?

6        A.    No.

7        Q.    Seen a photograph of him before that day?

8        A.    Yes.

9        Q.    Where?

10       A.    I obtained a photo the day prior.

11       Q.    I see.

12             What -- what was your duty on that day?

13   What were you supposed to be doing?

14       A.    I was assigned to PSA 704, street patrol;

15   just routine patrol.

16       Q.    In a patrol car, right?

17       A.    Yes, sir.

18       Q.    Did you have a partner, or were you

19   driving the car alone?

20       A.    I believe I was -- I was by myself --

21       Q.    Okay.

22       A.    -- both days, I think.
```

1      Q.    Now, did there -- did there come a time

2   where Mr. Young was -- where you encountered Mr.

3   Young?

4      A.    Yes.

5      Q.    Okay.  Would you tell us how that

6   transpired?

7      A.    Well, I recall the day prior, I believe,

8   which is the 26th of --

9           MR. DEBERARDINIS:  I can't help you.

10     A.    Okay.  Well, the day prior that I

11  personally got involved with him, there was a run

12  in PSA 701.  Officer Meyers --

13     Q.    By, A run, you mean a radio run?

14     A.    A radio run.

15     Q.    Okay.

16     A.    He -- he responded to an assignment which

17  involved a family disturbance.  While he was on the

18  scene, he -- he came over the radio, the 7D Zone,

19  and dispatched that the individual by the name of

20  Mr. Lamont Young was known to carry a weapon.

21          And he gave a physical description of the

22  individual, and he stated that the subject hangs

1   out at the Saddles Store, which is in the 2200

2   block of Alabama Avenue.  This is my PSA.  So

3   usually, if anybody is walking around, I will know

4   them; not maybe on a personal level, but just

5   seeing them in the block.

6            So at that point, I responded to the

7   police station and obtained a photo of Mr. Young,

8   and just proceeded looking for him.

9       Q.    Now, you indicated that there was a

10  description given?

11      A.    Yes.

12      Q.    What was the description?

13      A.    I do not remember.  I -- I know it was a

14  black male.  It was a physical description of his

15  clothing.  And the same clothing that was given the

16  day prior, he had the same description on that same

17  day.  That's how I kind of recognized him.

18           I'd be guessing if I -- if I said -- told

19  you the color of his shoes and shirt.  I just do

20  not recall exactly what it was.

21      Q.    Was it for a black male?

22      A.    Yes.

Transcript of Officer Anthony Allen
Conducted on June 21, 2017                    12

1       A.    I -- I do not -- I -- I can't recall

2    that.

3       Q.    Okay.  And what kind of photo is it or

4    was it?

5       A.    It was a mugshot photo.  Just a single

6    photo.

7       Q.    Do you still have that photo?

8       A.    No.  I gave that photo to the

9    investigators on the scene that day.

10      Q.    All right.  The --

11      A.    Oh.  The day that I came encounter [sic]

12   with Mr. Young.

13      Q.    The -- when you said, The investigators,

14   are you talking about the -- the use of force

15   investigators?

16      A.    I -- I can't recall which investigator it

17   was.  I -- I can't recall.

18      Q.    Okay.  Well, who was out there

19   investigating that day?

20      A.    Well, you had 7D detectives.  I mean, we

21   had officers out there.  I mean, the use of force

22   came.

Transcript of Officer Anthony Allen
Conducted on June 21, 2017                                    14

1      A.    I was on routine patrol.  As I entered

2  the parking lot in the 2200 block of Alabama

3  Avenue, I observed an individual who I recognized

4  by the clothing -- the -- of the physical

5  description I was given the day prior.

6           At which time, then, I looked at my photo

7  and saw that it was the same individual.  At that

8  time, I drove past the individual, and I advised

9  the 7D dispatcher that I had the subject in front

10 of the Saddles Discount Mart, which Officer Meyers

11 has given a prior lookout for yesterday, who's

12 known to carry a weapon.

13           I then -- when I entered the street, I

14 start backing up.  As I approached Alabama --

15      Q.    Now, when you say when you entered the

16 street, are you still in your vehicle or --

17      A.    Yes.

18      Q.    Okay.

19      A.    Yeah.  I'm still in my vehicle.

20           I started backing up toward Alabama

21 Avenue, Southeast.  As I approached the

22 intersection, that's when I observed Officer Powell

1  pull up behind me.  So at that time, I moved up

2  because I didn't want him parking his car in the

3  middle of the intersection.

4       Q.    Okay.  Had you asked for backup?

5       A.    Yes.  Yes.

6       Q.    Had you specifically asked for Officer

7  Powell, or just anybody in the area?

8       A.    No.  I just -- I just went over the air

9  and said, I had the individual that was -- a

10 description was given to, the day prior, for a

11 subject known to carry a weapon --

12      Q.    Okay.

13      A.    -- and he was in front of the Saddles

14 wearing the same clothing that he had on yesterday.

15      Q.    Okay.

16      A.    At that time, as I moved down a little

17 bit, I saw Officer Powell's door open.  When

18 Officer Powell's door opened, that's when I opened

19 my door and start walking toward Mr. --

20      Q.    Now, had you and Officer Powell talked

21 about how you were going to approach this

22 individual; how you were going to approach this

1    incident?

2        A.    No, not at all.

3        Q.    Okay.  Had you asked Officer Powell to

4    get out of the car, or what -- how did this happen?

5        A.    He pulled up, and his door opened.

6        Q.    Okay.  All right.  His door opened.

7              Now he's -- his car is behind your car or

8    --

9        A.    Correct.  It's behind.

10       Q.    Okay.  And his door opens.

11             What did you do?

12       A.    I then exit my vehicle.

13       Q.    Okay.  So you're both out at that point?

14       A.    I know I -- I saw his door open, and I

15   got out.  I -- I wasn't focused on Officer Powell.

16   I mean, I didn't look back to see exactly where he

17   was or what he was doing.  I had my focus on Mr.

18   Young.

19       Q.    All right.  Tell us what happened.

20       A.    Mr. Young was standing in front of the

21   Saddles.  He had his hands in his pocket.  Both

22   hands inside of his -- I think it was his jacket

1   have to stick your hands in pockets from the top,

2   kind of like my suit coat.

3       A.    Right.

4             I -- I -- I can't recall which --

5       Q.    Okay.  Did you see a weapon?

6       A.    I did not.

7       Q.    Did you see the outline of a weapon?

8       A.    I did not.

9       Q.    Did you see Mr. Young making any

10  threatening conduct toward anyone?

11      A.    Nothing threatening.

12      Q.    Did you see him making any assaultive

13  conduct toward anyone?

14      A.    No.

15      Q.    Okay.  So tell us what you did as you're

16  approaching.  And by, You, I'm referring to both

17  you and Officer Powell.  Is that accurate?

18      A.    Yes.

19      Q.    Okay.  Tell us what happened as you

20  approached him.

21      A.    As I was approaching Mr. Young, I advised

22  Mr. Young to take his hands out of his pocket; I

Transcript of Officer Anthony Allen
Conducted on June 21, 2017                    21

1    his hands out his pockets.

2        Q.    Suppose I said, I don't want to talk to

3    you?

4        A.    You have that right.

5        Q.    Then I'm walking away.

6        A.    Okay.  Under the circumstances, his

7    actions, we needed to investigate further.

8        Q.    What, because I don't want to talk to you

9    and I walk away?

10       A.    Well, actually, no.  Because the call

11   came out that -- when the call came out initially,

12   it stated that he was armed, and he's known to

13   carry a weapon.  My 27 -- however many years I had

14   on at that point -- led me to believe his

15   actions -- first of all, he was ignoring us.

16            And, then, when I first gave the first

17   lawful order, he started funneling [sic] inside of

18   his -- his jacket pocket with both hands as if he

19   was trying to conceal something.  At that point, I

20   got very concerned on this subject may be armed, or

21   could be armed.

22       Q.    Okay.  Why was that?

1      A.     Because of the way he was -- he was -- he

2   was trying to conceal something inside of his

3   jacket.

4      Q.     Did you see the outline of what appeared

5   to be a gun, a handle, the barrel?

6      A.     I did not.

7      Q.     Could you tell whether he was grasping

8   anything with his hands?

9      A.     The way his hands was moving, he could

10   have been grasping something.  That, I -- I did not

11   know --

12      Q.     I see.

13      A.     -- and I wasn't taking any chances.

14      Q.     So what did you do?

15      A.     I then gave him another lawful order to

16   take his hands out of his pocket and I need to talk

17   to him.

18      Q.     Okay.

19      A.     He also ignored that.

20      Q.     Now, was this before or after you'd asked

21   for backup?

22      A.     This was after.

1    little -- you know, you question, you know, what is

2    the motive here.  I mean, the call was that he --

3    he's known to carry a weapon.  I asked him to see

4    his hands.  He didn't take his hands out of his

5    pocket.  He pushed them down more and started

6    funneling or fidgeting or -- or like grasping

7    something.

8              I don't know what it was.  I couldn't see

9    it.  I mean, it could have been a split second.  He

10   could have shot through his jacket.  We don't know

11   that.  Okay.  So --

12      Q.    Who told you -- who told you that?

13      A.    Who told you what?

14      Q.    That he could have shot through his

15   jacket.

16      A.    Nobody has to tell me.  That -- I mean,

17   that's just experience.

18      Q.    Pardon me?

19      A.    I mean --

20      Q.    Did you discuss that experience with

21   anybody before coming in here to testify today?

22      A.    No, I did not, sir.

1    right?

2         A.    No.  My right to his left.

3         Q.    Got it.

4         A.    Okay.

5         Q.    All right.  What happened?

6         A.    At that point, Officer Powell, as -- as

7    he was walking, he got close enough where --

8    Officer Powell -- I heard Officer Powell say, I

9    said let me see your hands.

10            I saw Officer Powell reach out.  I don't

11   know if Officer Powell was trying to grab him or

12   keep the -- the distance.  At that point, he just

13   turned toward Officer Powell.

14        Q.    Now, when you say you saw Officer Powell

15   reach out, reach out, what, to you or to -- to Mr.

16   Young?

17        A.    Toward Mr. Young.

18        Q.    I see.

19            Was Officer Powell close enough to grab

20   Mr. Young when he reached out?

21        A.    It happened --

22        Q.    I'll --

1    A.     -- it happened so fast.

2    Q.     -- I'll rephrase it.

3           How -- how far away was Officer Powell

4    from Mr. Young when you saw Officer Powell reach

5    out?

6    A.     See, this -- this -- when -- when I saw

7    Officer Powell's arm reached out, that's when Mr.

8    Young aggressively turned toward Powell.  So if --

9    if Powell could have grabbed him before he turned,

10   I'm not sure.

11   Q.     Okay.  Now, just so the record is

12   accurate -- and you're testifying to what you

13   demonstrated -- you're demonstrating a reach-out

14   with your right hand.

15   A.     Well, I -- I don't know which hand it

16   was.

17   Q.     Okay.

18   A.     I just saw Officer Powell reach out.

19   Q.     And what did -- what was Officer Powell

20   reaching toward?

21   A.     Again, I don't -- that, I do not know.  I

22   mean, you know, usually we try to keep distance, a

1   body was positioned in relation to Officer Powell

2   when he -- Officer Powell shot him?

3        A.    He -- he turned toward Powell.

4        Q.    So --

5        A.    He turned toward him.

6        Q.    -- so my question is, is when he was

7   shot, was he facing Officer Powell?  Was he -- did

8   he have his back to Officer Powell?

9        A.    I -- I just know when -- when he -- when

10  he turned toward Powell, that's when I heard the

11  gunshot.

12       Q.    So he was facing Officer Powell when he

13  got shot?

14       A.    Yes.  If I -- if I'm -- yeah.  Yeah.  If

15  I recall, I think he was.

16       Q.    Okay.  Tell me everything you said to

17  Officer Powell -- that you recall saying to him as

18  this incident transpires.

19            And to orient you, you basically

20  indicated you're in an area.  You spotted a

21  subject.

22            Did I use the right term?

1   -- a -- a tossing motion, as if he was tossing

2   something.  In my peripheral, I can see a black cap

3   fall to the ground where Mr. --

4        Q.    A black cap?

5        A.    Like a top; like a valve top.  It was a

6   valve top.

7              And you could -- you can smell a strong

8   chemical odor which is commonly known as PCP on the

9   street.

10       Q.    Okay.  I take it you didn't see a gun?

11       A.    No.

12       Q.    Okay.  So I guess my question, again, for

13  you is, Mr. Young has been shot.

14             What do you do at that point?  What did

15  you do?

16       A.    I don't think -- I don't know, because

17  other units came on the scene at that point.

18  Supervisor was being notified.  The fire department

19  was being notified.  The ambulance was being

20  notified.

21       Q.    Union rep?

22       A.    I don't -- huh?

Transcript of Officer Anthony Allen
Conducted on June 21, 2017                                    63

1      Q.     Okay.  Okay.

2      A.     That's when he immediately turned kind of

3   aggressively toward Powell.

4      Q.     Okay.  And that -- is that when he was

5   shot?

6      A.     Yes.

7      Q.     Okay.  Could you show us where he was

8   when he walked toward you and, then, Officer Powell

9   said -- kind of reached at him and said, I said

10  take your hands out of your pockets, and he turned

11  to Officer Powell and was shot?

12     A.     That was about right -- what you need me

13  to write?  How do you want me to diagram -- put the

14  diagram?

15     Q.     Why don't you put -- put a circle and

16  put, L-Y.

17     A.     Okay.  That -- you want his position, not

18  ours, correct?

19     Q.     I want his position.  Then I'm going to

20  have --

21     A.     At the time he was shot?

22     Q.     Well, how about -- yeah, at the time he

Exhibit 5

METROPOLITAN POLICE DEPARTMENT
**CRIME SCENE INVESTGATION DIVISION**
**EVIDENCE REPORT**

| CSES NUMBER:<br>13-17618 | COMPLAINT NUMBER:<br>184-892 | TECHNICIAN:<br>Ronald Royster | UNIT:<br>CSIB | DATE:<br>12-27-13 |
|---|---|---|---|---|
| COMPLAINANT OR DECEDENT:<br>**Officer Thurman Powell** | | OFFENSE:<br>**Assault on a Police Officer misdemeanor**<br>**(Use of Force)** | | TIME:<br>**1240 Hours** |
| LOCATION OF OFFENSE:<br>22ⁿᵈ & Alabama Ave., SE | | | | PSA:<br>704 |
| TO:<br>Commander Officer: Superintendent of Detective | | FROM:<br>Commander: Crime Scene Investigation Division | | |
| ATTENTION:<br>Seventh District Detectives Office | | SECTION:<br>Crime Scene Investigation Division | | |
| THRU:<br>Patrol Services Division | | UNIT/DIVISION:<br>Crime Scene Investigation Division | | |

MCL: 13-17618

On December 27, 2013 at approximately 1300 hours, my services were requested at the offense location.  Upon my arrival, I was briefed by Detective Wayne Torres D1-1203 along with Detective Robbie Warren and the following services were rendered:

**Photos:**
Digital images of the scene were captured by Officer Rodney Langford and transferred to DIMS.

**Diagram:**
One sketch of the scene was completed by Officer Henry Gallagher.

**Evidence:**
Item 01—one 9mm cartridge casing was recovered 7'4" East of Pepco pole # 807370-2494 and 2'7" North of the same pole.

Item 02—one set of keys were marked on the scene and **returned to the owner on the scene by Detective Robbie Warren.**

Item 03—one black wallet containing personal items was recovered 20'9" East of Pepco pole 807370-2494 and 7'00" South of the same pole.

Item 04—one pair of socks were recovered 19'0" East of Pepco pole 807370-2494 and 3'6" South of the same pole.

Item 05—one Alcatec cell phone was recovered 19'0" East of Pepco pole 807370-2494 and 3'6" South of the same pole.

Item 06—one size 9 New Balance tennis shoe was recovered 19'0" East of Pepco pole 807370-2494 and 3'6" South of the same pole.

Item 07—one black bottle top was recovered 11'9" East of Pepco pole 807370-2494 and 2'8" South of the same pole.

Item 08—one red lighter was recovered 13'8" East of Pepco pole 807370-2494 and 2'8" South of the same pole.

| NAME OF MEMBER PREPARING REPORT:<br>*Ronald Royster* | BADGE NO.<br>2298 | REVIEWING OFFICIAL | UNIT<br>CSIB |
|---|---|---|---|

**FOR ID USE ONLY**

| Latents are of no value | Following Latent Prints are of Value:<br>__ FINGERS __ PALMS __ TIPS | |
|---|---|---|
| Per_____ | Per_____ | Forwarded_____By_____ |
| Date_____ | Date_____ | Entered_____<br>Property Book DEC 30 2013 ____ Page No._____ |

P.D. 668A 7/74

| METROPOLITAN POLICE DEPARTMENT WASHINGTON, D.C.<br><br>CONTINUATION OF EVIDENCE REPORT | OFFENSE:<br>Assault on a Police Officer misdemeanor<br>(Use of Force) | COMPLAINT NUMBER:<br>184-892 | 13-17618 |
|---|---|---|---|
| | LOCATION:<br>22nd & Alabama Ave., SE | CSSE NUMBER:<br>13-17618 | |

Item 09—one Hanes tank top was recovered 12'3" East of Pepco pole 807370-2494 and
    6'3" South of the same pole.

Item 09A—one white tee shirt with print on the front was recovered 12'3" East of Pepco pole 807370-2494 and
    6'3" South of the same pole.

Item 09B—one XL gray pull over POLO sweater was recovered 12'3" East of Pepco pole 807370-2494 and
    6'3" South of the same pole.

Item 09C—one black XXL/TG Helly Hanson coat was recovered 12'3" East of Pepco pole 807370-2494 and
    6'3" South of the same pole.

Item 09D—one Alcatec cell phone was recovered from the front left pocket of item 09C.

Item 10—one size 9 New Balance tennis shoe was recovered 2'5" East of Pepco pole 807370-2494 and
    9'2" South of the same pole.

Item 11—one glass bottle with a strong chemical odor was recovered 18'0" West of Pepco pole 807370-2494 and
    17'0" North of the same pole.

Item 12—one fragment was recovered 12'3" East of Pepco pole 807370-2494 and
    8'1" South of the same pole.

Item 13—one .40 caliber Glock 21, serial number DNR146 was recovered from the right rear floor board of a
Lexus ES300, Maryland tags
    80683HV, VIN: JTHBF30G825024783. The vehicle was parked alongside of 3222 22nd St., SE.

Item 13A—seven .40 caliber cartridges were recovered from the magazine of item 13 and one .40 caliber cartridge
    was recovered from the chamber of item 13.

Item 14—one 9mm Glock 17, serial number MP2293DC, was recovered from Officer Powell.

Item 14A—sixteen 9mm cartridges were recovered from the magazine of item 14 and one 9mm cartridge was
    recovered from the chamber of item 14. Thirty-four additional 9mm cartridges were recovered from
    Officer Powell's two additional magazines (17 each).

Item 15—buccal swab from Ms. Shelly Graves was turned over to me by Detective James McDonald on the scene.

Item 16—buccal swab from Mr. Anthony Wright was turned over to me by Detective James McDonald on the
    scene.

**Technician Notes:**

The evidence is listed on property book 1323 page 237 at the Crime Scene Investigation Division. No further
services were rendered at this time.

DEC 30 ~~~

| SIGNATURE OF REPORTING OFFICER:<br>*Ronald Royster* | ORG ELM<br>CSIB | Page of | SIGNATURE OF REVEWING OFFICAL: |
|---|---|---|---|



**U.S. Department of Justice**
**Drug Enforcement Administration**

Mid-Atlantic Laboratory
Largo, MD

## Chemical Analysis Report

Metropolitan Police Department
Washington, D.C.

**Case Number:** 13-184-892

### Observations, Results, and Conclusions:

| Exhibit | Laboratory Number | Substance(s) Identified | Net Weight | Substance Purity | Amount of Pure Substance |
|---------|-------------------|-------------------------|------------|------------------|--------------------------|
| 1 | 10490504 | Phencyclidine (PCP) | Residue | — | — |
| | | 1-Piperidinocyclohexanecarbonitrile (PCC) | | — | — |

Remarks:

### Exhibit Details:

**Date Received in Laboratory:** 04/18/2014      **Gross Weight:** 64.8 g

| Exhibit: | No. Units: | Pkg. Type (inner): | Color: | Form: | Description of Consistency/Texture: | Reserve Weight |
|----------|-----------|--------------------|--------|-------|-------------------------------------|----------------|
| 1 | 1 | Glass Bottle | Brown | Other | Other | Residue |

**Remarks:** Gross Weight includes the weight of all packaging materials and the evidence envelope.
Other = residue

### Exhibit Analysis:

**Sampling:**

Exhibit 1: Phencyclidine and 1-piperidinocyclohexanecarbonitrile confirmed in 1 unit tested of 1 unit received.

| Exhibit: | Summary of Test(s): |
|----------|---------------------|
| 1 | Gas Chromatography/Flame Ionization Detector, Gas Chromatography/Mass Spectrometry |

| Exhibit: | Purity Test(s): |
|----------|-----------------|
| — | — |

**Analyzed By:** Michaela Harper, Forensic Chemist          **Date:** April 21, 2014

**Approved By:** Rashida M. Weathers, Laboratory Director          **Date:** 4/28/14

DEA Form-113 (Sept. 2013 v2)

Page 1 of 1

# Exhibit 6

Audio recording hand-delivered to mailroom