**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LAMONT ANDRE YOUNG, | |
| Plaintiff, | Civil Action No. 14-2129 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| DISTRICT OF COLUMBIA *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Lamont Andre Young, who was injured after being shot in the back during a confrontation with officers of the District of Columbia's Metropolitan Police Department ("MPD"), filed suit against one of those officers, Thurman Powell, and the District of Columbia, raising Fourth Amendment Excessive Force and Eighth Amendment Cruel and Unusual Punishment claims, under 42 U.S.C § 1983, as well as various claims under District of Columbia law. The Court previously dismissed several of the plaintiff's claims, including the Fourth Amendment claim against the District of Columbia, and the Eighth Amendment and common law excessive force claims against both defendants. *See Young v. District of Columbia*, 107 F. Supp. 3d 69, 82–83 (D.D.C. 2015) (dismissing Count I against District of Columbia and Counts II and IV entirely). After over two years of discovery, the defendants have now filed a Motion for Summary Judgment ("Defs.' MSJ"), ECF No. 36, on the plaintiff's remaining claims in Count I (Fourth Amendment Excessive Force) against defendant Powell, and, against both defendants, Counts III (assault and battery), VI (Intentional Infliction of Emotional Distress), and VII (Negligent Infliction of Emotional Distress). For the reasons given below, the defendants' motion is denied.

## I. FACTUAL BACKGROUND

1

The material facts leading up to the moment of the shooting largely are undisputed. On December 26, 2013, MPD officers responded to a disturbance at 1728 W. Street SE, Washington, DC, where the plaintiff had had a verbal altercation with his friend, Crystal Perry. Incident Report at 1, 3, ECF No. 36-2; Dep. of Lamont Young ("Young Dep.") at 9:17–19, ECF No. 36-2. Ms. Perry informed the officers that the plaintiff had secured a black semi-automatic handgun in his waistband prior to leaving Ms. Perry's apartment. Incident Report at 3. Ms. Perry also informed the officers that the plaintiff had made threatening remarks toward law enforcement. *Id.* One of the responding officers radioed a lookout for the plaintiff based on the information Ms. Perry had provided. Dep. of Thurman Powell ("Powell Dep.") at 44:4–18, ECF No. 36-2; Dep. of Anthony Allen ("Allen Dep.") at 9:10–20, ECF No. 36-2.

Allen was on a routine street patrol when he heard the radio dispatch. Allen Dep. at 8:12–15, 9:10–14. The dispatch identified the plaintiff by name, provided a physical description, and informed dispatch that the plaintiff was armed, had threatened law enforcement officers, and frequented the Saddles discount store on the 2200 block of Alabama Avenue SE. *Id.* at 9:16–10:3; Dep. of Thurman Powell ("Powell Dep.") at 44:4–18, ECF No. 36-2. Allen went to a nearby police station and obtained an old mugshot photo of the plaintiff to help identify the plaintiff. Allen Dep. at 10:6–8, 12:3–6. Defendant Powell also heard the dispatch. Powell Dep. at 58:16–17.

The next day, the plaintiff visited his barbershop to get a haircut. Young Dep. at 23:2–5. There was a wait to be served, so the plaintiff borrowed the keys to his barber's car to drive to a nearby restaurant for breakfast. *Id.* at 23:5–9. The plaintiff encountered some acquaintances selling cigarettes outside before he could reach the car, however, and stopped to talk to them. *Id.* at 26:3–19. Allen observed the plaintiff, who was wearing the same clothing the radio dispatch

had described him to have worn the day before. Allen Dep. at 14:1–7. Allen requested backup, advising dispatch that he had located the plaintiff and that the plaintiff was known to carry a weapon. *Id.* at 14:7–12, 15:4–5. Defendant Powell responded to Allen's request for backup and arrived in his cruiser shortly thereafter. *Id.* at 14:20–15:1; Powell Dep. at 68:20–69:5. Upon arriving at the scene, defendant Powell observed the plaintiff leaning up against a wall, wearing the clothing Meyers's dispatch had described. Powell Dep. at 59:1–22, 76:6–7.

The plaintiff's acquaintances observed Allen approaching them and dispersed. Young Dep. at 28:19–20. Allen pulled up in his MPD cruiser behind the plaintiff, then pulled in front of the plaintiff and exited his cruiser. *Id.* at 29:7–18, 30:5–7, 20–22. Defendant Powell exited his cruiser as well. Powell Dep. at 69:21–22. Both officers approached the plaintiff, whose hands were in his jacket pockets. Allen Dep. at 16:19–22; Powell Dep. at 45:17–46:13, 49:18–20. Allen ordered the plaintiff to remove his hands from his pockets. Allen Dep. at 18:21–22.

At this point, the parties' narratives diverge. According to Allen, the plaintiff began "fu[mb]ling inside of . . . his jacket pocket with both hands as if he was trying to conceal something." Allen Dep. at 21:17–19. Allen, concerned that the plaintiff was armed, again ordered the plaintiff to remove his hands. *Id.* at 21:19–21, 22:15–17. The plaintiff did not comply, and instead "pushed" his hands "down more and started fu[mb]ing or fidgeting or . . . grasping something." *Id.* at 29:5–7. Allen heard defendant Powell order the plaintiff to show his hands, and observed defendant Powell "reach out" toward the plaintiff. *Id.* at 38:6–10. According to Allen, the plaintiff then "aggressively turned toward Powell." *Id.* at 39:8; 63:2–3. Allen then heard a gunshot. *Id.* at 44:9–11.

Defendant Powell testified that he and Allen ordered the plaintiff to remove his hands from his pockets. Powell Dep. at 46:1–8. The plaintiff initially ignored these orders and walked

away from the officers toward a vehicle parked in the middle of the street. *Id.* at 47:18–22; 51:20–22; 76:15. The plaintiff removed his hands from his pockets as he walked away. *Id.* at 77:7–8. Allen and defendant Powell again ordered the plaintiff to stop, but the plaintiff disobeyed, putting his hands back into his pockets and continuing to walk away. *Id.* at 77:10–17. Both officers repeatedly commanded the plaintiff to show his hands. *Id.* at 77:20–21. The plaintiff "then snatched his hand out of his pocket and put it inside his waistband." *Id.* at 77:22–78:1. The plaintiff suddenly "jerked his arm out," "as if he was pulling something out of his waistband," *id.* at 78:4–5, and "twisted towards" defendant Powell," *id.* at 125:4–6, 126:22–127:2. Defendant Powell fired his gun once at the plaintiff, *id.* at 78:5–6, and then radioed for an ambulance and for his supervisors, *id.* at 82:9–13. The plaintiff was unarmed. *Id.* at 101:7–10.

Crime scene investigators secured evidence from the scene, recovering a "glass bottle with a strong chemical odor" as well as a Glock 21 handgun from the right rear floorboard of a Lexus parked along 22nd Street SE. *See* Crime Scene Evid. Rpt. at 2, Items 11 & 13, ECF No. 36-2. The U.S. Drug Enforcement Administration later determined the bottled substance to contain phencyclidine ("PCP"). *See* DEA Chemical Analysis Rpt., ECF No. 36-2. Investigators found no gun on the plaintiff. *See* Crime Scene Evid. Rpt. at 2. Defendant Powell gave a statement to the MPD's Internal Affairs Division ("IAD") later that day, asserting that he had been focusing on the plaintiff's forearm and the back of the plaintiff's hand before discharging his weapon. Pl.'s Opp'n Def.'s MSJ, Ex. 4a, Officer Powell Statement to IAD ("Powell Statement") at 7, ECF No. 39-5. Defendant Powell did not say that he had seen anything in the plaintiff's hands prior to shooting him. *Id.* at 3, 5, 7. Defendant Powell told the IAD that he shot

the plaintiff because the plaintiff had made a "motion" while removing his hands from his jacket, causing defendant Powell to fear for his life. *Id.* at 5, 7.[1]

The plaintiff tells a different story. The plaintiff testified that his hands were in his pockets due to the cold December weather. Young Dep. at 32:15–22. According to the plaintiff, he initially complied with the instruction to remove his hands from his pockets, but then began to walk away because he believed Allen was harassing him. *Id.* at 31:4–32:19. The plaintiff reached his hands back into his pockets. *Id.* at 34:2–3. Allen commanded the plaintiff to freeze and remove his hands from his pockets, but the plaintiff refused and continued to walk away. *Id.* at 34:3–5. The plaintiff then removed his hands from his pocket, heard a "pow" noise, and fell to the ground from a gunshot wound to his back. *Id.* at 35:2–5, 36:21–37:2; Assistant Chief Robert Alder Testimony at Adverse Action Hearing at 114:18–19, ECF No. 40-3. At no point during this encounter did the plaintiff see defendant Powell. Young Dep. at 35:6–10.

DaQuan White, an employee at a store near the location of the incident, testified that he was standing outside on the sidewalk, approximately "15, 20 feet" from "where everything happened at," at the time "when everything went down." Dep. of DaQuan White ("White Dep.") at 125:23–25, ECF No. 40-1. White observed Young and saw Allen drive up. *Id.* at 127:22–23, 128:15. According to White, Allen instructed the plaintiff to remove his hands from his pockets, and the plaintiff initially complied, but then put his hands back in his pockets. *Id.* at 128:18–23. Allen again instructed the plaintiff to remove his hands from his pockets, and the plaintiff responded that the temperature was cold. *Id.* at 128:23–129:1. Allen repeated his command. *Id.* at 129:1–2. As Allen spoke, another officer pulled up. *Id.* at 129:2–3. At around this time,

---

[1] Another officer on the scene, Steve Sanchez, later gave a statement to the IAD that did not describe the plaintiff as having made any jerking motion or placed his hands in his waistband, but rather asserted that the plaintiff "kind of leaned over his right shoulder and kind of looked back, just prior to the [shooting]." Pl.'s Opp'n Def.'s MSJ, Ex. 6, Officer Sanchez Statement to IAD at 7, ECF No. 39-7.

White "walked to the corner where Mr. Young was." *Id.* at 130:5–6. The plaintiff removed his hands from his pockets, and the officer who just arrived shot him. *Id.* at 129:3–5. White testified that the plaintiff's hands were above his head and shoulders at the time he was shot. *Id.* at 129:5–14, 132:23–122:1. The plaintiff's hands remained above his head as the plaintiff fell to the ground. *Id.* at 134:11–12.

On June 23, 2014, a jury convicted the plaintiff of unlawful possession of a firearm and carrying a pistol without a license. DC Sup. Ct. Dkt., *United States v. Lamont A. Young*, 2013 CF2 0022729. On September 10, 2014, the plaintiff was sentenced to 42 months' imprisonment on the unlawful possession count and to 16 months' imprisonment on the carrying a pistol charge, to be served concurrently. *Id.* The plaintiff filed suit against defendant Thurman and the District of Columbia, under 42 U.S.C. § 1983, raising claims of excessive force, in violation of the Fourth Amendment, and cruel and unusual punishment, in violation of the Eighth Amendment Compl. ¶¶ 24–34, ECF No. 1. The plaintiff also raised claims of common law assault and battery, excessive force, negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress. *Id.* ¶¶ 35–64. The defendants filed motions to dismiss, Defs.' Mot. Dismiss Complaint, ECF No. 5; Def. Powell's Mot. Partial Dismissal, ECF No. 12, which the Court granted in part and denied in part, dismissing the plaintiff's Eighth Amendment claim against both defendants, the plaintiff's Fourth Amendment claim against the District of Columbia, the plaintiff's common law excessive force claim against both defendants, and all claims against defendant Powell "in his official capacity." Order Granting in Part & Denying in Part Def. Powell's Mot. for Partial Dismissal, ECF No. 16; Mem. Op. at 18, ECF No. 15.

Thereafter, at the plaintiff's request, to which the defendants consented, the Court repeatedly enlarged discovery in this case as the MPD's investigative and disciplinary processes

unfolded.  *See* Minute Orders, dated Dec. 21, 2015; Apr. 26, 2016; Aug. 30, 2016; Feb. 1, 2017;

June 28, 2017.  Specifically, the MPD's Use of Force Review Board ("UFRB") investigated the

shooting, reviewing statements and evidence that the MPD had amassed, and determined that

defendant Powell's use of force was not justified and not within departmental policy.  Pl.'s Mot.,

Ex. 1, UFRB Report at 1, ECF No. 39-1.    In so concluding, the UFRB disagreed with the IAD

investigator's recommendation that defendant Powell's use of force was justified and within

departmental policy.  *Id.*  The MPD initiated disciplinary proceedings against defendant Powell,

and the MPD's Adverse Action Panel ultimately found defendant Powell's use of force to have

been objectively reasonable and not in violation of departmental guidelines, recommending that

no action be taken against defendant Powell.  Defs.' Reply Supp. Mot. MSJ ("Defs.' Reply"),

Ex. 8, Adverse Action Panel Report at 22–27, ECF No. 43-2.

Discovery in this case ultimately lasted over two years.  *See* Minute Orders, dated June

19, 2015 and Sept. 27, 2017.  The defendants filed a motion for summary judgment on the

plaintiff's remaining claims of Fourth Amendment excessive force, assault and battery,

intentional infliction of emotional distress ("IIED"), and negligent infliction of emotional distress

("NIED"), Defs.' MSJ, which is now ripe for review.[2]

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(a).  "In making that determination, a court must view the evidence 'in the light most favorable

---

[2]        Although the defendants "move for summary judgment on all remaining claims in Plaintiff's Complaint,"
Defs.' MSJ at 1, they make no argument as to the plaintiff's negligence claim in Count V.  *See* Defs.' Mem., Compl.
¶¶ 47–55, and thus have not shown an entitlement to summary judgment on this claim.  The defendants assert that
"[o]n October 5, 2017, Plaintiff's counsel represented to [the defendants] that Plaintiff will dismiss Count V
(common law negligent training and supervision)."  Defs.' MSJ at 1 n.1.  The plaintiff has not sought this claim's
dismissal, however, meaning that the claim remains live.

to the opposing party.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  In other words, "'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Id.* at 1863 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (alterations omitted)).  "[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* at 1866 (quoting *Anderson*, 477 U.S. at 249).  The Supreme Court has stressed, in the qualified immunity context, "the importance of drawing inferences in favor of the nonmovant." *Id.*

## III.   DISCUSSION

The defendants argue that defendant Powell is entitled to summary judgment on the plaintiff's Fourth Amendment Excessive Force claim because defendant Powell did not violate the plaintiff's Fourth Amendment rights and, in the alternative, any rights violated were not clearly established at the time of the shooting.  The defendants also argue that they are entitled to summary judgment on the plaintiff's District of Columbia assault and battery and intentional infliction of emotional distress ("IIED") claims, in Counts III and VI, respectively, for essentially identical reasons.  Finally, the defendants argue that the plaintiff has failed to state a claim for negligent infliction of emotional distress ("NIED") in Count VII, and that this claim therefore must be dismissed.  Each of these arguments is addressed in turn.

### A.   Genuine Issues of Material Fact Exist as to Plaintiff's Fourth Amendment Excessive Force Claim to Overcome Defendant Powell's Qualified Immunity Defense.

The defendants contend that defendant Powell's conduct was objectively reasonable and did not violate the plaintiff's clearly established Fourth Amendment rights, entitling defendant Powell to qualified immunity from the plaintiff's damages claim for use of excessive force in Count I.  Defs.' MSJ at 1. Following a summary of the applicable legal framework, the factual

record, viewed in the light most favorable to the plaintiff, is analyzed to determine whether

qualified immunity bars this claim. The Court concludes that the plaintiff's Fourth Amendment

Excessive Force claim may proceed to trial.

### 1. Legal Framework

#### a. Qualified Immunity

Section 1983 of Title 42, U.S. Code, creates a cause of action against "[e]very person

who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory

or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States

or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The defense of qualified

immunity may be asserted by "government officials performing discretionary functions" to

shield them from civil damages liability in such a suit "as long as their actions could reasonably

have been thought consistent with the rights they are alleged to have violated." *Anderson v.*

*Creighton*, 483 U.S. 635, 638 (1987). "Qualified immunity attaches when an official's conduct

does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting

*White v. Pauly,* 137 S. Ct. 548, 551 (2017) (per curiam)); *see also Pearson v. Callahan*, 555 U.S.

223, 231 (2009) ("The doctrine of qualified immunity protects government officials 'from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'" (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982))). "'Because the focus is on whether the officer had fair

notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at

the time of the conduct.'" *Kisela*, 138 S. Ct. at 1152 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

Courts use "a two-step sequence for resolving government officials' qualified immunity claims." *Pearson*, 555 U.S. at 232. "First, a court must decide whether the facts . . . shown make out a violation of a constitutional right." *Id.* (internal citation omitted). "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

Although a case need not be "directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551). "Specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (alterations omitted)). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Id.* at 1153 (quoting *Mullenix*, 136 S. Ct. at 309). "Precedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful." *Id.* (quoting *Mullenix*, 136 S. Ct. at 312). "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have

understood that he was violating it.'" *Id.* at 1153 (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).  At the same time, a court "need not identify cases with 'materially similar' facts, but have only to show that 'the state of the law at the time of the incident gave the officer fair warning that his alleged misconduct was unconstitutional.'" *Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (alterations omitted)).

### b.  The Fourth Amendment

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. CONST. amend. IV.  "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  "We analyze a section 1983 claim of excessive force in violation of the Fourth Amendment under the constitutional 'objective reasonableness' standard."  *Hall v. District of Columbia*, 867 F.3d 138, 157 (D.C. Cir. 2017) (quoting *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017)).  "We assess whether the use of force was reasonable by balancing the 'nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'"  *Id.* (quoting *Tolan*, 134 S. Ct. at 1865).  In determining whether a use of force was reasonable, a Court "pay[s] 'careful attention to the facts and circumstances of the particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether she is actively resisting arrest or attempting to evade arrest by flight.'"  *Id.* (quoting *Johnson*, 528 F.3d at 974 (alterations omitted)).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989)  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.  Moreover, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.  An officer's use of force is unreasonable where the facts, viewed in the light most favorable to the plaintiff, offer "no indication that [the plaintiff] posed any threat to" anyone or "had committed a serious crime." *Hall*, 867 F.3d at 157.  "[I]f an excessive force claim turns on which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official." *Saucier v. Katz*, 533 U.S. 194, 216 (2001) (Ginsburg, J., concurring in the judgment (quoted with approval in *Johnson*, 528 F.3d at 977)).

### 2.    Analysis

As noted, evaluation of a police officer's claim to qualified immunity requires a two-pronged inquiry to determine "(1) whether the facts in the record show the officers' conduct violated a constitutional right, and if so, (2) whether the constitutional right was clearly established at the time of the incident." *Corrigan v. District of Columbia*, 841 F.3d 1022, 1029 (D.C. Cir. 2016).  With respect to the first prong, and viewing the facts in the light most favorable to the plaintiff, defendant Powell's use of force was excessive.

White testified that the plaintiff's hands were already above his head and shoulders at the time defendant Powell shot him. White Dep. at 129:5–14, 132:23–24, 134:11–12. Accepting this testimony as true, the plaintiff neither "pose[d] an immediate threat to the safety of the officer or others" or was "actively resisting arrest or attempting to evade arrest by flight." *Hall*, 867 F.3d at 157 (quoting *Johnson*, 528 F.3d at 974). To the contrary, the plaintiff's raising his hands in the air above his head "was so obviously an attempt to comply with the officers' commands . . . that a reasonable officer would have known that opening fire would constitute excessive force." *Partlow v. Stadler*, 774 F.3d 497, 503 (8th Cir. 2014).

Nor does "the severity of the crime at issue," *Hall*, 867 F.3d at 157, make defendant Powell's use of force reasonable. The defendants argue that "[g]iven the information contained in the dispatches, Officer Powell reasonably believed that Plaintiff was potentially armed and dangerous." Defs.' Reply at 5. This is true, but only up to a point. The officers were entitled to rely on the dispatches throughout their interactions with the plaintiff, *see United States v. Hensley*, 469 U.S. 221, 231 (1985) ("[E]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another." (quoting *United States v. Robinson*, 536 F.2d 1298, 1299 (9th Cir. 1976))), but only until the time that the plaintiff clearly manifested, by raising his hands in the air above his head where the officers could see them, that he was not holding a weapon, and that he posed no threat. At that point, any information communicated over the dispatch could not give the officers probable cause to believe a clearly unarmed, surrendering man posed a danger to them or others. *See Flythe v. District of Columbia*, 791 F.3d 13, 22 (D.C. Cir. 2015) ("That an individual at one point posed a threat does not grant officers an irrevocable license to kill. Justification for deadly force exists only for the life of the threat."); *see also Hall*, 867 F.3d at 157 (holding that force is

excessive when "no indication" exists that a plaintiff "posed any threat to" anyone or "had committed a serious crime"); *Johnson*, 528 F.3d at 975 (holding that "repeatedly kicking a surrendering suspect in the groin [] produces [no] law enforcement benefit that might outweigh the serious harm it causes").[3] As such, no "importan[t] [] governmental interests" existed "to justify the intrusion" upon the plaintiff's "Fourth Amendment interests." *Hall*, 867 F.3d at 157 (quoting *Tolan*, 134 S. Ct. at 1865).

The defendants do not dispute that defendant Powell's use of force would have been unreasonable had defendant Powell perceived the plaintiff to have raised his empty hands in the air above his head. Instead, the defendants argue that White's testimony that the plaintiff's hands were in the air is immaterial as to defendant Powell's perception of the plaintiff at the time of the shooting because "White viewed the encounter from a different vantage point." Defs.' Reply at 9–10. White testified that before the shooting, he had "walked to the corner where Mr. Young was." White Dep. at 130:5–6. Crediting White's testimony as true and drawing all reasonable inferences therefrom, White thus had an unimpeded close-range view of the plaintiff during the moments leading up to the shooting, and accurately could perceive the plaintiff's actions. Defendant Powell, meanwhile, testified that he was "maybe 20—20 feet, if that," away from the plaintiff in the moments before he fired his weapon, "towards [the plaintiff's] right; like

---

[3]    The defendants argue that *Flythe* is inapposite because "*Flythe* involved a fatal shooting where none of the bystander witnesses could 'testify as to exactly what happened between' the officer and the decedent." Defs.' Reply at 4 (quoting 791 F.3d at 19). "Given that 'the witness most likely to contradict the officer's story—the person he shot dead—was unable to testify,'" the defendants argue, "the Court could 'not simply accept what may be a self-serving account by the police officer' and instead undertook a 'fairly critical assessment of the forensic evidence.'" *Id.* (quoting 791 F.3d at 19 (alterations omitted)). "The Court reversed the trial court's entry of judgment for the defendant officer because his testimony 'conflicted with that of every other witness, as well as the physical evidence' and there was evidence suggesting that he was under the influence of methamphetamines when he shot the decedent." *Id.* at 5 (quoting 791 F.3d at 20 (alterations omitted)). Although the witness in *Flythe* best positioned to dispute the officer's story was indeed deceased, *Flythe* undertook the same analysis a court always performs at the summary judgment stage, asking whether a genuine dispute of material fact existed. *See* 791 F.3d at 19–22. The fact that the plaintiff, unlike the decedent in *Flythe*, lived to tell his tale thus does not materially distinguish *Flythe*.

14

at an angle, coming down the hill." Powell Dep. at 78:16–20. The defendants fail to explain how anything about defendant Powell's position or vantage point would have prevented him from observing that the plaintiff's hands were raised in the air above his head, as White testified. To the contrary, if defendant Powell were only twenty feet away from the plaintiff at the time he fired his weapon, a trier of fact reasonably could infer that defendant Powell clearly could perceive the plaintiff's actions, including the plaintiff's raising his hands into the air above his head. A trier of fact likewise reasonably could conclude that defendant Powell's uphill position relative to the plaintiff did not impede, and if anything may have enhanced, defendant Powell's ability accurately to perceive the situation.

The defendants rely on *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 786, 788 (4th Cir. 1998), for the proposition that "White's testimony does not create a triable issue of fact as to the threat that a reasonable officer in Officer Powell's position faced." Defs.' Reply at 10. *Sigman*, however, does not support the defendants' position. *Sigman* concluded that a police officer "reasonably perceived a threat to his safety and the safety of others and that his response [shooting the decedent] therefore was objectively justified and reasonable" despite affidavits from three witnesses declaring that the decedent was not holding a knife when he was shot. 161 F.3d at 786–88. *Sigman* reasoned that these affidavits "cannot effectively impact the credibility of [the officer's] testimony (or that of all five other officers on the scene) as to his perceptions of what he saw from an entirely different—and closer—vantage point," given that "[t]he three witnesses in this case were located across the street amidst a crowd cheering Sigman on, as if the confrontation were a game or contest." *Id.* at 787–88. Here, in contrast, White observed the incident from a vantage point sufficiently similar to that of defendant Powell to enable a jury reasonable to conclude that White's perception of the plaintiff is probative of how a reasonable

officer in defendant Powell's position would have perceived the plaintiff at the moment defendant Powell fired his weapon. White testified that he was approximately "15, 20 feet" from "where everything happened at" "when everything went down," and had "walked to the corner where Mr. Young was" shortly before the shooting occurred. White Dep. at 125:24–25, 130:5–6. Defendant Powell, meanwhile, testified that he was approximately "20 feet, if that," away from the plaintiff in at the time he fired his weapon. Powell Dep. at 78:19–20. The defendants offer nothing but conclusory assertions to explain how White perceived the incident from a vantage point too different from that of defendant Powell to testify reliably as to what a reasonable officer in defendant Powell's position would have perceived. That the officer in *Sigman* "had special knowledge of Sigman's dangerousness and of the threats that Sigman had made on his life," 161 F.3d at 788, does not change this analysis. Nothing in *Sigman* suggests that such "special knowledge," *id.*, by itself could allow an officer reasonably to believe a person whom the officer perceived to be holding no weapon posed a danger to the officer or others. To the contrary, *Sigman* discussed the significance of the officer's "special knowledge" only after discounting the testimony of the three witnesses who testified that the decedent was unarmed. Here, as explained above, White's testimony cannot be discounted.

The defendants further argue that "White did not know that Plaintiff was possibly armed and that he had threatened law enforcement officers." Defs.' Reply at 10. This is immaterial, as the defendants fail to explain how defendant Powell reasonably could have perceived the plaintiff to have posed a threat to anyone with his empty hands raised in the air above his head. The defendants argue that it "does not matter that Plaintiff testified that he was shot while simply complying with orders to show his hands," as "Plaintiff repeatedly disobeyed commands to stop and show his hands before he suddenly decided to 'comply.'" Defs.' Reply at 8. "None of his

other actions on the scene," the defendants say, "suggested that he was surrendering." *Id.* To the contrary, raising one's hands in the air above one's head, where others clearly can see that no weapon was at hand, does suggest surrender. Nor do the defendants explain in any way how the plaintiff's prior disobedience, when commanded to stop and show his hands, create caused to believe the plaintiff posed a threat to the officers or others by the time the plaintiff's hands were in the air above his head. The defendants assert that "[f]rom Officer Powell's perspective, it was just as likely that Plaintiff was pulling out a gun." *Id.* As explained above, however, the defendants fail to offer any explanation as to how defendant Powell could have believed the plaintiff was pulling out a gun if the plaintiff's hands already were in the air above his head. For these reasons, viewing the factual record in the light most favorable to the plaintiff, defendant Powell's shooting of the plaintiff violated the plaintiff's Fourth Amendment rights.

As to the second prong of the qualified immunity inquiry, the Court must determine whether the Fourth Amendment rights that defendant Powell violated were clearly established at the time of the shooting. Here, the relevant inquiry is "whether a reasonable officer could have believed that" shooting the plaintiff "after he had surrendered and posed neither a risk of flight nor any danger was a lawful means of effecting a seizure under the Fourth Amendment." *Johnson*, 528 F.3d at 975–76. "An officer's act of violence violates the Fourth Amendment's prohibition against unreasonable seizures if it furthers no governmental interest, such as apprehending a suspect or protecting an officer or the public." *Id.* at 976.

*Johnson* provided defendant Powell "fair warning that his alleged misconduct was unconstitutional." *Id.* (alterations and internal quotation marks omitted). There, police mistook the plaintiff for a drug dealer's armed accomplice, aimed guns at the plaintiff, and commanded the plaintiff "to put up [his] hands." *Id.* at 972. The plaintiff "immediately complied," and then,

"[w]ith his hands still raised, . . . turned away from the [lead officer's] gun and fell through the open doorway of his apartment, landing face-down on the floor." *Id.* "While [the plaintiff] was prone on the floor with his arms and legs spread, [the officer] repeatedly kicked and stomped his groin and buttocks." *Id. Johnson* determined "that a reasonable officer would not have repeatedly kicked the surrendering suspect in the groin." *Id.* at 974. While recognizing that the officer "ha[d] a legitimate and substantial interest in apprehending an armed suspect and protecting himself and the public from possible harm," *Johnson* reasoned that "it is not clear how kicking [the plaintiff] in the groin furthered either of the[se]" interests." *Id.* at 975. *Johnson* concluded that "[s]ummary judgment was premature because there exists a genuine issue of material fact, namely, whether [the plaintiff's] prone position was threatening or suggested escape." *Id.* at 977. "That dispute," *Johnson* explained, "can only be resolved by evaluating the conflicting testimony of [the plaintiff] and [the officer]." *Id.*

Here, as in *Johnson*, a genuine dispute of material fact exists as to whether a reasonable officer in defendant Powell's position could have believed that the plaintiff's "position was threatening or suggested escape." *Id.* As in *Johnson*, the facts viewed in the light most favorable to the plaintiff suggest that the plaintiff clearly had manifested his intent to surrender, such that a reasonable officer could not have perceived otherwise. To be sure, *Johnson*'s facts are not identical to those of the case at hand; the *Johnson* plaintiff arguably more clearly manifested his intent to surrender by "f[a]ll[ing]" onto the ground, "landing face-down on the floor," and remaining "prone on the floor with his arms and legs spread." *Id.* at 972. Identical facts are not required, however, to "have placed the . . . constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152 (internal quotation marks omitted); *see also Johnson*, 528 F.3d at 976 ("We need not identify cases with 'materially similar' facts, but have only to show that 'the state of the law

at the time of the incident gave the officer fair warning that his alleged misconduct was unconstitutional.'" (alterations and internal quotation marks omitted)). A jury crediting White's testimony reasonably could conclude that the plaintiff, in raising his hands in the air above his head, had manifested his intent to surrender in a sufficiently obvious manner that no officer in defendant Powell's position reasonably could have perceived otherwise.

*Garner*, which held that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead," 471 U.S. at 11, also put defendant Powell on notice of his conduct's unlawfulness. That the plaintiff survived his encounter with defendant Powell is immaterial given that the force defendant Powell used was deadly. The Supreme Court has admonished that "the general rules set forth in *Garner* . . . do not by themselves create clearly established law outside an 'obvious case.'" *Kisela*, 138 S. Ct. at 1153 (quoting *White*, 137 S. Ct. at 552 (internal quotation marks omitted)). This is such an obvious case. Taking White's testimony at face value, as the jury is entitled to do, defendant Powell shot a clearly unarmed and surrendering man who had raised his hands in the air above his head. Under these circumstances, *Garner*'s "general statements of the law" can "giv[e] fair and clear warning to officers." *Id.* (quoting *White*, 137 S. Ct. at 552).

Thus, the constitutional right defendant Powell is alleged to have violated was clearly established at the time of the shooting. For these reasons, defendant Powell is not entitled to summary judgment on the plaintiff's Fourth Amendment Excessive Force claim in Count I.

### B. Genuine Issues of Material Fact Exist as to the Plaintiff's Assault and Battery and IIED Claims

The defendants argue that summary judgment is warranted as to the plaintiff's assault and battery and IIED claims in Counts III and VI, respectively. Defs.' Mem. Supp. MSJ ("Defs.' Mem.") at 14–16, ECF No. 36. As explained below, however, the defendants are not entitled to

summary judgment on these claims, for reasons similar to those making summary judgment on the plaintiff's Fourth Amendment Excessive Force claim inappropriate.

### 1. Legal Framework

Under District of Columbia law, "[a]n assault is an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim." *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007) (internal quotation marks omitted). "A battery is an intentional act that causes a harmful or offensive bodily contact." *Id.* (internal quotation marks omitted). "A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary." *Id.* (citation omitted). "Moreover, any person, including an officer, is justified in using reasonable force to repel an actual assault, or if he reasonably believes he is in danger of bodily harm." *Id.* (citation omitted). "Use of deadly force, however, is lawful only if the user actually and reasonably believes, at the time such force is used, that he or she (or a third person) is in imminent peril of death or serious bodily harm." *Id.* (emphasis and internal quotation marks omitted). The standard of reasonableness in the assault and battery context is similar to that in the Fourth Amendment Excessive Force context. *See Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993) (quoting *Graham*, 490 U.S. at 396–97); *accord Armbruster v. Frost*, 962 F. Supp. 2d 105, 117 (D.D.C. 2013) ("[The] standard for analyzing an assault and battery claim against an officer is similar to the excessive force standard applied in the Section 1983 context." (internal quotation marks omitted)).

"To establish a *prima facie* case of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Larijani v.*

*Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002). "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (internal quotation marks omitted). Under District of Columbia law, "there can be no recovery for negligently inflicted mental suffering that is not traceable to a direct physical injury," *Williams v. Baker*, 572 A.2d 1062, 1064 (D.C. 1990), unless "the defendant has an obligation to care for the plaintiff's emotional well-being or the plaintiff's emotional well-being is necessarily implicated by the nature of the defendant's undertaking to or relationship with the plaintiff, and serious emotional distress is especially likely to be caused by the defendant's negligence." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 792 (D.C. 2011).

### 2. Analysis

The defendants argue that defendant Powell is entitled to judgment on the plaintiff's assault and battery claim "because Officer Powell actually and reasonably believed that Plaintiff was pulling out a gun at the time he shot Plaintiff." Defs.' Mem. at 14. Given that a jury, viewing the facts in the light most favorable to the plaintiff, reasonably could find that a reasonable officer in defendant Powell's position could not have believed the plaintiff was pulling out a gun at the time defendant Powell shot the plaintiff, defendant Powell is not entitled to summary judgment on the plaintiff's assault and battery claim. The defendants' argument that defendant Powell "is entitled to the qualified privilege with respect to the assault and battery claim because he had a good faith belief that his life was in danger and his belief was reasonable," Defs.' Reply ay 16, fails for the same reason.

Likewise, the defendants argue that they are entitled to summary judgment on the plaintiff's IIED claim because defendant Powell's "use of force [wa]s reasonably necessary in

order to respond to an imminent threat to a police officer's safety." Defs.' Mem. at 15. As explained above, however, a jury reasonably could find that the plaintiff posed no imminent threat to anyone, and that an officer in defendant Powell's position could not reasonably have perceived otherwise. The defendants further argue, "[w]ith respect to Plaintiff's IIED claim, [that] no reasonable jury could find that Officer Powell's act of self-defense was atrocious and utterly intolerable." Defs.' Reply at 15 (internal quotation marks omitted). Crediting White's testimony as true, however, a jury reasonably could find that defendant Powell's shooting of an unarmed man who clearly had raised his hands in the air above his head was indeed atrocious and utterly intolerable.

Finally, because genuine disputes of material fact exist as to the plaintiff's assault and battery and IIED claims, the defendants' argument that "the District [of Columbia] cannot be liable for these claims under *respondeat superior*" on the ground that the plaintiff's "claims fail as a matter of law," Defs.' Reply at 16, fails.

### C.     The Plaintiff Has Stated an NIED Claim

Finally, the defendants contend that the plaintiff fails to state a NIED claim in Count VII because "[t]o the extent Plaintiff intended to plead NIED based on Officer Powell's decision to shoot Plaintiff, it is axiomatic that an intentional use of force cannot serve as the basis for a separate negligence claim." Defs.' Mem. at 16–17. The plaintiff, however, bases his NIED claim not on the defendant Powell's decision to shoot the plaintiff, but on the District of Columbia's failure to properly train and supervise defendant Powell and other officers and personnel who handcuffed the plaintiff after the shooting, and later restrained the plaintiff "in

shackles and a belly chain while in the hospital." *See* Compl. ¶¶ 59–64.  The defendants entirely fail to address these arguments.  Dismissal of the plaintiff's NIED claim thus is unwarranted.[4]

## IV.     CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is denied. The parties are directed to submit jointly, within fourteen days, (1) three proposed dates in October and/or November 2018, for a pre-trial conference and for trial, (2) the number of witnesses each party intends to call at trial, and (3) the estimated length of the trial.

An appropriate order accompanies this Memorandum Opinion.


**SO ORDERED.**

Date: August 20, 2018


_____
BERYL A. HOWELL
Chief Judge

---

[4]     For this reason, dismissal of the plaintiff's NIED claim against the District of Columbia under a *respondeat superior* theory, *see* Defs.' Reply at 16, likewise is improper.